
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

UNITED STATES of AMERICA

v.  Criminal Action No. 4:19cr93

ANTONIO LAMONT HOLLOMAN,

Defendant.

## OPINION & ORDER

This matter come before the Court on Antonio Lamont Holloman's ("Defendant") Motion to Suppress, Doc. 19. For the reasons therein, the Defendant's Motion to Suppress is **DENIED**.

### I. INTRODUCTION

Defendant is charged in a one-count indictment with Possession of a Firearm by a Convicted Felon pursuant to 21 U.SC. § 922. Doc. 13 ("Indictment"). Defendant avers that all obtained evidence was procured by law enforcement in violation of the Fourth Amendment. Doc. 19. The evidence that Defendant seeks to suppress supports the factual base for the one count in the Indictment. Defendant argues that the evidence in his case must be suppressed because his seizure went beyond the scope of a Terry stop and amounted to a de facto arrest unsupported by probable cause. Doc. 19. In the alternative, Defendant avers that even if the stop is considered a Terry stop, it was unsupported by reasonable suspicion and is therefore unlawful. Id.

## II. MOTION TO SUPPRESS

**A. Facts**

On December 31, 2018, at approximately 23:55, a call was placed to 911 with information that an individual was waving a gun in the air. Defendant Statement of Facts, Doc. 19 at 2 ("DSOF"). The caller, later identified as R.S. ("R.S"), reported that the individual was a "black male with a white hat and a white and black jacket [and] was waving a firearm in the air and at passerby [sic] in the vicinity of 30th Street and Marshall Avenue in the City of Newport News, Virginia." Government Statement of Facts, Doc. 21 at 2 ("GSOF"). Officers from the Newport News Police Department, including Officer R.B. Stewart, responded to the area of 30th Street and Marshall Avenue in Newport News. Id. Officers report this area is "typically known for prostitution and narcotics activity." Hr'g Tr. 8:14-15 (Jan. 14), Doc. 28 at 8.

Upon arrival at the scene, officers stepped out of their vehicles and were approached by R.S. who was openly carrying a firearm in the waistband of his shorts. GSOF at 2; see Hr'g Tr. 61:11-14 (Jan. 14), Doc. 28 at 61. The officers inquired about a report that there was an individual with a gun in the area. Id. R.S. at that time informed police that he was the one who called 911. GSOF at 2. He followed up with additional information that the individual with the gun "pointed it at [him and] pointed it at another young dude." Id. at 3. R.S. also identified that the individual in question was across the street on a porch with a group of people. Id. He then gestured "behind him towards a residence just south of 26th Street and Marshall Avenue." Id. The officers checked the R.S.'s identification card but noted that he wished to remain anonymous. DSOF at 3.

The officers went to the residence and observed Defendant step off the porch and walk across the yard. GSOF at 3. They observed that Defendant matched the description given by the 911 call and approached. Id. The officers surrounded Defendant with one officer approaching from

the street and the other blocking his return to the porch. Id. The officers began giving commands such as "come here", "put your hands up", and "you're being detained right now." DSOF at 3. Defendant inquired why he was being detained and was told that he "match[ed] the description of an individual brandishing a firearm." Id. The officers at that point grabbed Defendant's arms, placed them behind his back and handcuffed him. Id. The officers stated that Defendant had an odor of alcohol on his breath, was unsteady on his feet and at times unresponsive to the officers' commands. GSOF at 3. At this point, the officers patted down Defendant and found a 9mm Smith & Wesson pistol. Id. The officers inquired if Defendant had a concealed carry permit and Defendant did not respond. Id. The officers proceeded to run a search and were informed Defendant did not have a concealed permit for the firearm. Id. The officers at that point arrested Defendant for Possession of a Concealed Weapon, Public Intoxication and Reckless Handling of a Firearm, all misdemeanors. Id. at 3-4. The time from which the officers approached Defendant to the determination that he did not have a concealed carry permit was approximately three to four minutes. Hr'g Tr. 14:22 (Jan. 14), Doc. 28 at 14.

On route to the jail, the officers were informed that Defendant had prior felony convictions. GSOF at 3-4. Therefore, Defendant was further charged with Felon in Possession of a Firearm. Id. The Commonwealth of Virginia declined to prosecute Defendant on these charges. DSOF at 4. Officer Gerard Buergert, an ATF Task Force Officer with the Newport News Sheriff's Office, drafted an affidavit in support of a criminal complaint in this Court, charging Defendant with Felon in Possession of a Firearm. Id. Officer Buergert arrested Defendant on October 24, 2019. After being advised of his Miranda rights, Defendant, made statements to law enforcement and admitted he possessed the firearm despite knowledge that he was prohibited because of his felony. DSOF at 4-5; GSOF at 4.

3

## B. Legal Standard and Analysis

### *i. Terry Stop and Frisk*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court of the United States recognizes that the Fourth Amendment allows an officer to stop and briefly detain a person for investigative purposes when there is "reasonable suspicion," based on articulable facts, that criminal activity "may be afoot." United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). To determine whether there is reasonable suspicion for a Terry stop, courts should look to the "totality of the circumstances." United States v. Arvizu, 534 U.S. 266, 273 (2002). In viewing the totality of the circumstances, "[r]easonable suspicion requires 'more than an inchoate and unparticularized suspicion or hunch'; rather, the government agent must articulate a particularized, objective basis for his or her actions." United States v. Kehoe, 893 F.3d 232, 237 (4th Cir. 2018). Accordingly, the Fourth Circuit has characterized reasonable suspicion as a "commonsensical proposition" allowing courts to credit "the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

In cases of an informant tip, the Supreme Court has similarly adopted a "'totality of the circumstances' approach to determining whether an informant's tip establishes probable cause" and/or reasonable suspicion. Alabama v. White, 496 U.S. 325, 328-29 (1990) (stating that the probable cause "factors are also relevant in the reasonable suspicion context, although allowance must be made in applying them for the lesser showing required to meet that standard."). The factors of an informant's "veracity," "reliability," and "basis of knowledge" are "highly relevant in determining the value of his report." Id. at 328. Therefore, "[r]easonable suspicion, like probable

cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors--quantity and quality--are considered in the "totality of the circumstances--the whole picture . . . ." Id. at 330 (noting that "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable."). To establish reasonable suspicion, the court must ensure that the "tip possesses sufficient indicia of reliability." United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004) (citing Florida v. J.L., 529 U.S. 266, 270 (2000)). With an anonymous tip, "it must be accompanied by some corroborative elements that establish the tip's reliability." Id. (citing J.L., 529 U.S. at 270). However, when an informant confers a message to an officer face-to face, "an officer can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion." Id. (citing Adams v. Williams, 407 U.S. 143, 146-47 (1972)). Tips, in reality, "fall somewhere on a spectrum of reliability" and "a reviewing court may - indeed must - take into account all the facts surrounding a tip in assessing the totality of the circumstances supporting a stop." Id. at 324.

If reasonable suspicion is present and officers are conducting a valid Terry stop, law enforcement may additionally conduct a protective frisk "if presented with a reasonable belief that the person may be armed and presently dangerous." United States v. Black, 525 F.3d 359, 364 (4th Cir. 2008) (citing Adams v. Williams, 407 U.S. 143, 146 (1972)). The Terry Court highlighted that with regards to a frisk the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." Terry, 392 U.S. at 23. Consequently, the Supreme Court:

> imposes two requirements for conducting a frisk, but no more than two: first, that the officer have conducted a lawful stop, which includes both a traditional Terry stop as well as a traffic stop; and second, that during the valid but forced encounter, the officer reasonably suspect that the person is armed and deliberately linked "armed" and

5

"dangerous," recognizing that the frisks in those cases were lawful because the stops were valid and the officer reasonably believed that the person stopped "was armed and thus" dangerous."

United States v. Robinson, 846 F.3d 694, 700 (4th Cir. 2017) (noting that because an individual is armed they are therefore dangerous) (quoting Terry, 392 U.S. at 28). Accordingly, once an officer has made "a lawful investigatory stop, he may protect himself during that stop by conducting a search for weapons if he "has reason to believe that the suspect is armed and dangerous." United States v. Mayo, 361 F.3d 802, 808 (4th Cir. 2004) (quoting United States v. Burton, 228 F.3d 524, 528 (4th Cir. 2000)).

Here, Defendant contends that the tip was "unreliable and insufficient to support a finding of reasonable suspicion." Doc. 19 at 16. The facts presented here are similar to the cases of United States v. Christmas, 222 F.3d 141 (4th Cir. 2000) and United States v. Quarles, 330 F.3d 650 (4th Cir. 2003). In Christmas, officers were approached by an intoxicated woman who informed them that individuals on the porch of 401 Canal Street, two doors down from her, had drugs and guns. Christmas, 222 F.3d at 143. The woman provided her address but not her name. Id. Upon approaching the porch, an officer recognized one of the suspects as Joseph Christmas. Id. The officers proceeded to approach and conduct a pat down search of the four individuals. They found a loaded .357 Magnum along with crack cocaine and marijuana. Id. The Fourth Circuit upheld a finding of reasonable suspicion noting that a face-to face tip does not pose the same creditability issues as an anonymous interaction. Id. at 144. The court, there, held that both:

> the close proximity of the informant's residence to the illegal activities at 401 Canal Street. It was reasonable for Officer Smith to conclude that a woman living two doors from 401 Canal Street would know if drugs were being dealt from the porch there. Second, the informant's proximity to 401 Canal Street at the time she spoke with Officer Smith further bolstered her credibility. By informing the police about her neighbors' illegal activity, the informant exposed herself to the risk of reprisal. The fact that she provided the report to uniformed police officers in public only increased the probability that someone associated with the illegal activity would witness her aid to the police.

Id. The court also highlighted that there was additional corroboration of the informant's tip. The officer that performed the stop:

> knew Christmas and found it odd that he would be present on Canal Street, given the tensions between gangs based near Canal Street and gangs from Christmas' part of town. Based on this information, it was reasonable for Officer Smith to surmise that Christmas' presence on the porch created a potential for violence.

Id. at 145. Therefore, the proximity of the informant to the events and the provision of self-identifying information provided the tip with the sufficient reliability to meet the reasonable suspicion standard.

In Quarles, a 911 operator received a call stating that Quarles was walking down the street carrying a bag with a gun inside of it. Quarles, 330 F.3d at 652. The caller informed the operator that Quarles had a warrant out for his arrest and that the caller had been notified by a U.S. Marshall, Pervis Smith, to contact the police if the caller saw Quarles. Id. The caller proceeded to stay on the line for fourteen minutes while the offices responded. The caller proceeded to identify himself and agreed to wait in his car, so the officers could speak to him directly. Id. An Officer Taylor proceeded to approach Quarles and conduct a stop to check if Quarles did in fact have an open warrant for his arrest. Id. Officer Taylor arrested Quarles after receiving confirmation that he had an outstanding warrant. Id. The Fourth Circuit upheld the district court's finding that there was reasonable suspicion to stop and check if there was an open warrant for Quarles. Id. at 654-55. The court highlighted that the caller was not anonymous when he identified "himself to the dispatcher, and indeed, went a step further and arranged for the police to meet with him after the phone call to verify the information." Id. at 655. The court found that the tip provided enough information to "test [the] knowledge or credibility" of the information. Id. The informant provided:

> a detailed description of the defendant (including his name, the color of jersey he was wearing with the number that was on the jersey, _ his hairstyle, and his exact location),

Rainey knew that there was a warrant out for the defendant's arrest, the type of offense that the defendant was wanted for (involving possession of a firearm), the fact that he was carrying a bag with a gun, and the name of the U.S. Marshal involved in the case.

Id. Additionally, the informant "provided sufficient information to the police that he could have been held accountable for his statements" such as his name, information about the murder of his brother, the name of a U.S. Marshal who he spoke to and his location. Id. at 656. Accordingly, this circumstance warranted a finding that the informant was reliable. Id.

Reading the Fourth Circuit's decisions in tandem, the Court **FINDS** the informant's tip was reliable and that there was reasonable suspicion to conduct a Terry stop. In this case, the informant called 911 to report the brandishing of a firearm and then proceeded to approach responding officers to provide his testimony of events. During this interaction, the informant provided his identification card to the officers. The fact that the informant wished to remain anonymous is of no importance as he provided law enforcement with identifying information. See United States v. Saddler, 275 F. App'x 549, 550-51 (7th Cir. 2008) (not anonymous where caller provided "his name and the address of his store," even though he asked to remain anonymous, refused to identify his store by name, and did not provide his phone number). At the time that the caller provides identifying information to officers, he is no longer an anonymous tipster but is more akin to a known informant. These types of informants are different than anonymous tipsters because courts will "generally presume that a citizen-informant or a victim who discloses his or her identity and basis of knowledge to the police is both reliable and credible." United States v. Kehoe, 893 F.3d 232, 238 (4th Cir. 2018). Accordingly, a face-to-face report is "'more trustworthy and reliable than [an] anonymous tip' because law enforcement can hold the informant accountable for false statements." United States v. Talvin Taquane Lawing, 703 F.3d 229, 236 (4th Cir. 2012) (quoting Christmas, 222 F.3d at 144.).

In a face-to-face encounter, numerous factors have been considered to determine that the informant's tip was reliable. Here, the informant was in close proximity and had personally viewed the brandishing of the firearm. See United States v. Perkins, 363 F.3d 317, 322 (4th Cir. 2004) (noting the caller was in close proximity to the events and personally observed the criminal activity as a factor that enhanced the tip's reliability). The informant, after making the 911 call, remained on the public street and approached responding officers to provide a statement. See United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) (highlighting the fact that she provided the report to uniformed police officers in public enhanced reliability as the informant was risking reprisal to do so). The informant also provided a detailed description of Defendant's clothing and current location. See United States v. Quarles, 330 F.3d 650 (4th Cir. 2003) (the 911 caller provided a detailed description of the individual which allowed the "dispatcher to make a determination about his credibility."). Additionally, the officers were able to corroborate the informant's information when they responded to the porch in question and saw an individual matching the exact description provided. Accordingly, the totality of the circumstances warrants a finding that the informant's tip had the indicia of reliability sufficient to provide officers with reasonable suspicion that Defendant was brandishing a firearm. Since the officers had reasonable suspicion, the Court **FINDS** the Terry investigative stop was lawful.

After making the lawful stop, the officers then proceeded to frisk Defendant for weapons. To do so lawfully, the officers must have had "reasonable grounds to believe that the suspect is armed and dangerous." United States v. Mayo, 361 F.3d 802, 807 (4th Cir. 2004). These circumstances support a finding that the protective frisk was lawful. The 911 call and the face-to-face report indicated that the suspected crime was the brandishing of a firearm. This coupled with the fact that it was a late hour at night in an area known for criminal activity provides enough

"reason to believe" that Defendant was armed. See United States v. Moore, 817 F.2d 1105, at 1107-08 (4th Cir. 1987) (noting that a combination of factors including a late hour at night, occurrence in a high crime area and that the suspected crime involves use of a weapon supports a finding that there is reasonable cause to conduct a frisk). Accordingly, the officers had reasonable grounds to conduct a frisk of Defendant. Therefore, the Court **FINDS** that both the Terry stop and subsequent frisk were lawful.

*ii. De Facto Arrest and Probable Cause*

Despite a finding of reasonable suspicion, "[a] Terry or investigative stop can cross the line and turn into an arrest ... [if], under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.'" Young v. Prince George's Cty., 355 F.3d 751, 755 (4th Cir. 2004) (quoting Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001)); see United States v. Elston, 479 F.3d 314, 319 (4th Cir. 2007) ("[A]n arrest is defined using an objective standard: whether 'the suspect's freedom of action is curtailed to a degree associated with formal arrest.'"). The Fourth Circuit has noted that the mere perception "that one is not free to leave is insufficient to convert a *Terry* stop into an arrest. . . ." Elston, 479 F.3d at 319; see United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995). Accordingly, "[a] brief but complete restriction of liberty is valid under Terry." Elston, 479 F.3d at 319 (quoting Leshuk, 65 F.3d at 1109). Thus, the restriction of liberty "do[es] not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989).

If a Terry stop is determined to be a de facto arrest, the arrest for a minor crime committed in the officer's presence must be supported by probable cause to be constitutionally reasonable. Virginia v. Moore, 554 U.S. 164, 171 (2008); see Maryland v. Pringle, 540 U.S. 366, 370 (2003)

("A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause."). Probable cause, like reasonable suspicion is "dependent upon both the content of the information possessed by the police and its degree of reliability." Alabama v. White, 496 U.S. 325, 330 (1990). It is important to note that probable cause is a more demanding standard than reasonable suspicion as "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Id.

Defendant argues that the evidence in his case must be suppressed because his seizure went beyond the scope of a Terry stop, amounted to a de facto arrest and was unsupported by probable cause. Doc. 19 at 5. The Supreme Court in United States v. Hensley, 469 U.S. 221, 235 (1985), articulated a general rule that "officers conducting a *Terry* stop are authorized to 'take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). The Fourth Circuit in United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995), identified that actions such as "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest . . . ." Leshuk, 65 F.3d at 1109-10; see Moore, 817 F.2d at 1108 (highlighting that a stop does not necessarily become a custodial arrest where the officers draw their weapons, threaten use of force and/or handcuff a suspect). Additionally, the brief questioning of a suspect does not transform the stop into a custodial arrest as "Terry stops typically involve the officer asking, 'a moderate number of questions to determine [the detainee's] identity and to try to obtain information confirming or

dispelling the officer's suspicions.'" Leshuk, 65 F.3d at 1110 (quoting Berkemer v. McCarty, 568 U.S. 420, 439 (1984)).

Here, the officers "ordered him [Defendant] to put his hands up, told him he was under investigation, and then handcuffed him and moved him toward waiting squad cars, all while questioning him about his conduct." Id. After Defendant was handcuffed Officer Stewart conducted a frisk for the possession of weapons. Since the officers had reasonable cause to suggest Defendant was armed, his brief restraint was reasonable to "protect [officer] safety during an investigative stop." Crittendon, 883 F.2d at 329 (quoting United States v. Taylor, 857 F.2d 210, 213 (4th Cir. 1988). The officer's testimony notes that the entire interaction lasted approximately two to three minutes to briefly stop Defendant, attempt to obtain information about the suspected activities and to conduct a frisk for weapons. See Hr'g Tr. 14:22 (Jan. 14), Doc. 28 at 14. The Court **FINDS**, that under the totality of the circumstances, the brief questioning and restraint of Defendant did not convert a lawful Terry stop into a custodial arrest. Accordingly, because the investigative stop and frisk was not a custodial arrest, the circumstances do not require the Court to determine whether or not probable cause existed.

### III. CONCLUSION

For the following reasons therein, the Defendant's Motion to Suppress is **DENIED**.

The Clerk is **REQUESTED** to deliver a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
~~January~~ 7, 2020
Feb